# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA
# EASTERN DIVISION

| | |
|---|---|
| Melland Company, successor by merger to Melland Real Estate Company,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>Secura Insurance Companies,<br><br>　　　　　Defendant. | **ORDER**<br><br>Case No.  3:21-cv-58 |

　　　　Before the Court are two motions for summary judgment. The first is a motion for partial summary judgment filed by Plaintiff Melland Company ("Melland"). Doc. No. 18. The second is a motion for summary judgment filed by Defendant Secura Insurance Companies ("Secura"). Doc. No. 21. Secura also filed a motion for hearing. Doc. No. 22. For the reasons below, Secura's motions are denied, and Melland's motion is granted.

**I.　　FACTS**

　　　　This action involves the partial collapse of a commercial building[1] in Jamestown, North Dakota and the related insurance coverage dispute over whether the partial damage to the Building resulted in a "constructive total loss." Melland is the owner of the Building, and Russell Melland is Melland's president. Doc. No. 19 at 2. Secura is an insurance company that specializes in property and casualty insurance. Doc. No. 1-2. Secura insured the Building under a Business Protector Policy (the "Policy"), effective from November 18, 2018, to November 18, 2019. Doc. No. 23-1. Per the Policy, the amount of insurance written for the Building was $3,164,000. Id.

---

[1] The "Building" is actually two separate structures (the "East Building" and the "West Building") standing adjacent and adjoined by a gutter system.  Doc. No. 23-2 at 15.  While there are references and documents that refer to the "East Building" and the "Building," the Policy at issue here insured the entire structure as the Building.

### A. The Snow Event and First Collapse

On March 13, 2019, a heavy snowfall damaged the roof of the Building and caused an awning on the south side of the East Building to collapse. Doc. No. 23-4. Shortly after the storm, Thomas Blackmore, a Building Inspector for the City of Jamestown, requested that Melland remove the awning and clear the snow load off the roof so the City could inspect the damage. Id. After the snow load was cleared, a buckled girder was discovered, suggesting the roof was compromised. Blackmore deemed the East Building a "dangerous building" per the City of Jamestown's Municipal Code. Id. He gave Melland 30 days to repair or demolish the East Building. Id. Blackmore's letter stated that if repairs were made, "a Structural Engineer will be required to provide the design required for a building permit." Id.

### B. Initial Structural Engineer Reports

Melland then had contractor James Schumacher inspect the property. Doc. No. 23-2 at 20. Schumacher, in turn, asked Ryan Heyer, a structural engineer, to inspect the damage. Id. at 26. Heyer authored a field report in June 2019 (the "Heyer Report"). Doc. No. 23-7. The Heyer Report states:

> It is our professional opinion that the building as it exists today will require extensive reinforcement, to both fix the failed roof girder and to bring the building up to code. We feel that it would not be economical or feasible to do so. We do not have experience with the actual construction of this nature but there is a possibility without major demolition it may be impossible. This is especially true with the foundation system if needing reinforcements and additional pad footings installed, also for verification of what exists.

Id. Around the same time, Secura, having been notified of a claim by Melland,[2] hired Lon Eraldson, a senior engineer with PIE Consulting and Engineering, to inspect the Building. Doc. No. 23-12. The September 16, 2019, PIE Observation Report (the "PIE Report") concluded the damage was repairable "under a general reading of the code." Id. It estimated the cost of repairs to be approximately $40,000. Id.

### C. Second Collapse

Nine and a half months after the first collapse, on January 4, 2020, a second collapse occurred in the same area as the first. Doc. No. 19. Melland submitted another claim to Secura for the second collapse.[3] Id. On January 14, 2020, Blackmore sent another letter to Melland regarding the Building, stating:

> I feel that I have given you ample time to either repair this building or have the building demolished. I need a written Plan of Correction and a Timeline of how you plan to proceed with either repair or demolition of the building by no later than 5:00 pm of January 24th, 2020. This Plan of Correction and Timeline should have a start date and a date of completion. I would like to see a completion date of no later than February 29th, 2020.

Doc. No. 23-8. The letter warned Melland that if a "Plan of Correction and a Timeline" were not received, he would notify the Jamestown City Council of Melland's noncompliance. Id. On January 24, 2020, Russell Melland responded to Blackmore and indicated he did not intend to submit a written plan of correction or a timeline. Doc. No. 23-9.

---

[2] The record is less than clear as to Secura's and Melland's communications as to notice and extent of the damage. For example, Melland cites specific language from a October 31, 2019, letter to Secura indicating the Building is a total loss. Doc. No. 25 at 12-13. However, this letter is not in the record.

[3] Melland claims the March 2019 collapse caused a constructive total loss. Doc. No. 1-2. In the alternative, Melland asserts the January 2020 incident caused a constructive total loss. Id.

### D. Second Structural Engineer Reports

Melland then retained Tom Schanandore, a structural engineer with CW Structural Engineers, to reexamine the damage to the Building and issue a report. Schanandore's February 14, 2020, Structural Assessment Report (the "Schanandore Report") concluded the damage was less than "substantial structural damage," so the collapsed portion of the Building could be repaired back to its pre-damaged condition. Doc. No. 23-11 at 6. However, it also stated it would be "imprudent" to repair and suggested "the collapse[d] portion of the Building and any other damaged elements would need to be repair/re-constructed to meet current building code requirements for snow load." Id. Further, it concluded the Building was "dangerous and unsafe," though it may have been so even before the collapse. Id.

Secura then had Erlandson complete a supplemental report, given the second collapse. The June 29, 2022, Supplemental Memorandum (the "Supplemental Report") found that even if the repairs had to be made to up to the current building code, the repairs would be limited to the damaged area and did not require updates to the remaining, undamaged portions of the Building. Doc. No. 23-13 at 5-6. It further stated that a cost-effective repair could be constructed to bring the damaged part of the Building up to current code, and that the second collapse would not have occurred if Melland had made immediate repairs after the buckled girder was discovered. Id. at 5.

### E. City of Jamestown's Discussions and Findings

Eventually, the Jamestown City Council met on March 2, 2020, and discussed the status of the Building. Doc. No. 23-10. Russell Melland testified at the meeting. Id. Ultimately, the City found:

> Mr. Melland acknowledged that the East portion of the Building is a dangerous building and should be demolished. Mr. Schumacher, who is the general contractor for Melland Company indicated he would likely be able to demolish the East portion of the building within 30-45 days.

4

<u>Id.</u> On March 4, 2020, the Mayor of the City of Jamestown signed an order providing:

> The City of Jamestown hereby orders Melland Company to demolish the East portion of the building located at 202 Business Loop West, Jamestown, North Dakota, 58401 by May 1, 2020.

<u>Id.</u> Melland then notified Secura of the City's decision and of its plan to demolish the Building.

Melland completely razed the Building in the summer of 2020. Doc. No. 23-2 at 14.

### F. The Policy and the Valued Policy Statute

Turning to the Policy, no one disputes the Building is "Covered Property" under the Policy.

<u>Id.</u> The property damage coverage provisions of the Policy state, in relevant part:

> **5.   Additional Coverages**
>
> \* \* \*
>
> **d.   Collapse**
>
> **(1)** We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this policy, if the collapse is caused by one or more of the following:
>
> **(a)** The "specified cause of loss" . . . , all only as insured against in this policy;
>
> \* \* \*
>
> **H.   Property Definitions**
>
> \* \* \*
>
> **6.** "Specified Causes of Loss" means the following:
>
> . . . weight of snow, ice or sleet[.]

<u>See</u> Doc. No. 23-1. The parties agree that the Building sustained a specified cause of loss.

The Policy also includes a "North Dakota Changes" endorsement that states, in relevant part:

5


    **C.**    The following is added to the **Loss Payment** Property Loss Condition:

**VALUED POLICIES**

1.    When this policy is written to insure any real property in North Dakota against loss caused by or resulting from any Covered Cause of Loss, and the property is <u>wholly or completely destroyed by any Covered Cause of Loss</u> without fraud on the part of the insured or assignee, the amount of insurance written on such real property will be taken to be the true value of the property insured and the true amount of loss and measure of damages, subject to Paragraphs **C.2., C.3.** and **D.** below.

(Emphasis added). This endorsement follows North Dakota's valued policy statute, which states:

> Whenever any insurance policy is written or renewed to insure any real property in this state, including structures owned by persons other than the insured, against loss caused by or resulting from any covered cause of loss and the insured property is <u>wholly or completely destroyed by any covered cause of loss</u> without fraud on the part of the insured or the insured's assigns, the amount of the insurance written in the policy is the true value of the property insured and the true amount of loss and measure of damages[.]

N.D. Cent. Code § 26.1-39-05(1). (Emphasis added).

### G.    Procedural Posture

Ultimately, Secura did pay Melland $42,377.77 (the actual cash value of the damage from the first collapse) for the partial damage caused by a covered cause of loss under the Policy. Doc. No. 24. Melland's position, however, is that the Building sustained a constructive total loss, and as a result, it is entitled to the amount of the insurance written in the Policy for the Building (or $3,164,000). To that end, Melland commenced an action against Secura in North Dakota state court, which Secura then removed to this Court. Doc. No. 1.

## II.    <u>LAW AND ANALYSIS</u>

As noted from the start, the critical issue in the cross motions for summary judgment is whether the partial collapse of the Building after the March 13, 2019, snow event resulted in a constructive total loss. Secura argues that, as a matter of law, the Building was not wholly or

completely destroyed and did not suffer any constructive total loss. Melland disagrees, noting there are fact issues that preclude summary judgment. For its part, Melland's motion seeks an order recognizing that North Dakota Century Code section 26.1-39-05 applies to the Policy, and if Melland proves a constructive total loss occurred, Melland is entitled to the amount of the insurance written in the Policy for the Building.  Secura does not oppose Melland's motion.

### A.     Summary Judgment Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014)).

"At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." Nunn v. Noodles & Co., 674 F.3d 910, 914 (8th Cir. 2012) (citing Anderson, 477 U.S. at 249). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward

with 'specific facts showing that there is a genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). "However, if a plaintiff cannot support each element of its claim, summary judgment must be granted, because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial." Cousineau v. Norstan, Inc., No. 00-1113 DSD/JGL, 2001 WL 1640118, at *3 (D. Minn. July 26, 2001), aff'd, 322 F.3d 493 (8th Cir. 2003) (citing Celotex, 477 U.S. at 322-23).

### B.  Constructive Total Loss

The Court turns to Secura's motion first. To start, the parties agree on several key points—first, that the Policy covers the Building, and second, that the March 2019 snow event is a covered cause of loss per the Policy. The real dispute is over the extent of the damage, and whether the Building sustained a "constructive total loss," as Melland suggests, or if the Building sustained only partial, repairable damage, as Secura suggests.

North Dakota law applies here. The concept of constructive total loss originates from valued policy statutes. Valued policy statutes, which generally apply to real property and have been adopted in many states, are designed to provide definite standards of insurance recovery in the case of a total loss, typically caused by a fire or other natural disasters. The purpose of the statute, as explained by the North Dakota Supreme Court, is two-fold: "(1) to relieve the insured from the burden of proving the value of his property after its total destruction, and (2) to prevent overinsurance by discouraging insurance companies from collecting premiums on overvalued property, but then contesting value, and hence liability, when it becomes to their advantage to do so." Stevick v. Nw. G. F. Mut. Ins. Co., 281 N.W.2d 60, 63 (N.D. 1979). As noted above, North

Dakota's valued policy statute is found in North Dakota Century Code section 26.1-39-05(1) and states:

> Whenever any insurance policy is written or renewed to insure any real property in this state, including structures owned by persons other than the insured, against loss caused by or resulting from any covered cause of loss and the insured property is <u>wholly or completely destroyed by any covered cause of loss</u> without fraud on the part of the insured or the insured's assigns, the amount of the insurance written in the policy is the true value of the property insured and the true amount of loss and measure of damages[.]

Id. (emphasis added).

Naturally though, what constitutes a "total loss" or "wholly or complete destroyed" is subject to much litigation and judicial interpretation. In North Dakota, the only case to directly address the valued policy statute and the concept of constructive total loss is Stevick. In Stevick, a residential home was partially damaged after a fire, and ultimately, the City of Minot ordered the home be destroyed. Id. at 61-62. The question was whether the loss was a constructive total loss, or a partial, repairable loss. Id.

The North Dakota Supreme Court concluded the home was a constructive total loss under the valued policy statute because the City of Minot condemned the home and ordered it to be demolished following the fire. The North Dakota Supreme Court reasoned that compulsory condemnation by a governmental authority is an extension of the constructive loss doctrine, "i.e., a fire loss is considered total if a building has lost its identity and specific character even though some parts remain standing." Id. Said another way, Stevick recognizes one common principle and extension of the constructive total loss doctrine—that when a building is compulsory condemned by a governmental authority after sustaining damage by a covered caused of loss, even if a portion of the building remains standing, the loss is a "constructive" total loss.

9

Here, Melland attempts to analogize this case to Stevick. However, the cases are distinguishable. In Stevick, the City of Minot ordered demolition within a month of the fire (id. at 61), whereas here, the demolition was not ordered by the City of Jamestown for roughly ten months. There also appeared to be, at least initially, an opportunity for Melland to make repairs to the Building and avoid condemnation entirely, which is quite different than Stevick where the opportunity to repair was foreclosed quickly. Id. Further, in Stevick, the North Dakota Supreme Court specifically discussed and distinguished a New Jersey case where the property at issue sustained repairable damage. See id. at 64 (discussing Feinbloom v. Camden Fire Ins. Ass'n, 149 A.2d 616 (N.J. App. Div. 1959)). So, put simply, Stevick is not controlling on the facts of this case.

Taking a step back from the specific holding of Stevik, however, there is the basic principle of constructive total loss, as recognized in passing by the North Dakota Supreme Court, that focuses on whether the building "has lost its identity and specific character, even though some parts remain standing." Stevick, 281 N.W.2d at 63. Somewhat related to the loss of identity and specific character question is the concept (recognized by some courts, but not the North Dakota Supreme Court) of a constructive total loss occurring when the cost to repair exceeds the value of the building. See Darmer v. State Farm Fire & Cas. No., No. 17-4309, 2020 WL 514261, at *8 (D. Minn. Jan. 31, 2020). Although North Dakota has not specifically adopted either approach, both inquires focus more or less on assessing the extent of the damage in determining whether a constructive total loss occurred.

Assuming without deciding, for the purposes of this motion, that North Dakota would likely follow the identity and specific character inquiry, the question is whether the damage to the Building as a result of the March 13, 2019, snow event resulted in the Building losing its identity

and specific character. And on that question, the Court is essentially left with a case of conflicting expert opinions.[4]

On the one hand are Melland's experts reports, including the Heyer Report and Schanandore Report. Accorinding to the Heyer Report, "the building as it exists today will require extensive reinforcement[.] We feel that it would not be economical or feasible to do so." Doc. No. 19-3. While it is concerning that the Heyer Report lacks any specific repair estimates and does not explain what "not economical or feasible" means in this case, it raises questions as to the extent of the damage from the first collapse. In addition to the Heyer Report, the Schanandore Report reaches similar conclusions, stating "it would be imprudent to allow the current east building to be occupied, without substantial repair/reinforcement[.]" Doc. No. 23-11. It also states that "a repair/reinforcement course of action, taken to save the building, would incur substantial expense[.]" Id. And beyond Melland's expert reports is the decision by Mr. Blackmore deeming the Building "dangerous." Doc. No. 23-4.

However, on the other hand are Secura's expert reports, including the PIE Report and its Supplemental Report. The PIE Report concludes, "based on a reasonable degree of engineering certainty," that the "[d]amages were generally limited" and "the structural elements can be restored (replaced) to the conditions prior to the damage." Doc. No. 23-12. The PIE Report also provides actual repair estimates for the damage, estimating a repair cost of approximately $40,000. Id. Moreover, the Supplemental Report concludes, "The relatively minor structural damages from the March 13, 2019 collapse were readily repairable to conditions prior to the damage with similar structural elements as allowed by the current building code at that time." Doc. No. 23-13.

---

[4] In this Court's view, this is likely the same result under a cost of repair compared to actual value inquiry as well on these facts and given the record.

11

Although the Court may be quite skeptical that the partial damage at issue here resulted in the Building losing its identity and specific character, it is the province of the jury, not the Court, to make fact decisions and weigh expert testimony and reports. See Anderson, 477 U.S. at 251-52 (credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are left for trial). When viewing the evidence in the light most favorable to Melland, there is a genuine issue of material fact as to the extent of the damage to the Building and whether the partial collapse following the March 2019 snow event caused the Building to lose its identify and specific character, effectively wholly or completely destroying the Building.

While a genuine issue of material fact precludes summary judgment, the Court does share Secura's public policy concerns and concerns about Melland's unilateral decision to raze the Building, then seek the amount of the insurance written in the Policy for the Building. On that front, it is worth emphasizing that the constructive total loss doctrine is a specific doctrine that is not intended to apply in all cases where a partial covered loss occurs. And it is also not intended to provide a windfall to the insured. Rather, the doctrine is really meant to cover those rare circumstances where a partial loss (caused by a covered cause of loss) is, for all intents and purposes, a complete and total loss. The Court has its own reservations as to whether this case is one of those rare circumstances, but unfortunately, the fact disputes as to the extent of the damage preclude the Court from granting summary judgment for Secura. Nonetheless, this order should not be taken as an endorsement of allowing insureds to convert partial covered losses into constructive total losses through their own decisions and conduct.

On this particular record, a genuine issue of material fact remains as to whether the Building sustained a constructive total loss so that the Building was "wholly or completely

destroyed" by a covered cause of loss. And as a result, Secura's motion for summary judgment is denied.

### C. Applicability of North Dakota Century Code § 26.1-39-05

On a final note, Melland's motion for partial summary judgment seeks a determination that, as a matter of law, if Melland proves the Building sustained a constructive total loss, Melland is entitled to the amount of the insurance written in the Policy for the Building (again, $3,164,000). Secura does not oppose the motion, except to reiterate its position that the Building did not sustain a constructive total loss.

Again, as discussed at length above, North Dakota's valued policy statute states:

> Whenever any insurance policy is written or renewed to insure any real property in this state, including structures owned by persons other than the insured, against loss caused by or resulting from any covered cause of loss and the insured property is wholly or completely destroyed by any covered cause of loss without fraud on the part of the insured or the insured's assigns, the amount of the insurance written in the policy is the true value of the property insured and the true amount of loss and measure of damages[.]

N.D. Cent. Code § 26.1-39-05(1). Melland's motion accurately reflects the plain language of the statute. Accordingly, the Court grants Melland's motion and limitedly concludes that, if Melland Company can prove the Building sustained a constructive total loss, then it is entitled to the amount of the insurance written in the Policy for the Building, or $3,164,000, consistent with North Dakota Century Code section 26.1-39-05.

### III. CONCLUSION

The Court has carefully reviewed the record, the parties' filings, and the relevant legal authority. On this particular record, fact issues preclude summary judgment. Accordingly, Secura's motion for summary judgment (Doc. No. 21) is **DENIED**, and Melland's motion for partial

summary judgment (Doc. No. 18) is **GRANTED**. Given the extensive briefing on the motion, the Court also **DENIES** Secura's motion for hearing (Doc. No. 22).

**IT IS SO ORDERED**.

Dated this 19th day of December, 2022.

> */s/ Peter D. Welte*
> Peter D. Welte, Chief Judge
> United States District Court